1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VERONICA HILL,

        Plaintiff,

  v.

LINCOLN NATIONAL LIFE INSURANCE,

        Defendant.
_____/

No. C -13-00276 EDL

**ORDER DENYING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

      Before the Court is Defendant's Motion for Partial Summary Judgment in which Defendant

seeks a judgment that Plaintiff's state law claims for breach of contract, breach of the covenant of

good faith and fair dealing and intentional infliction of emotional distress are preempted by the

Employee Retirement Income Security Act ("ERISA").  The Court held a hearing on October 8,

2013 and the parties filed supplemental briefs on October 11 and 16, 2013.  For the reasons stated at

the hearing and in this Order, Defendant's Motion for Partial Summary Judgment is denied.

**Facts**

      In December 2005, the Contra Costa County Labor Coalition ("CCCLC") submitted an

application to Defendant's predecessor Jefferson Pilot Financial Insurance Company[1] for coverage

under a master group long-term disability policy that had previously been issued to the Jefferson

Pilot Financial Insurance Company Voluntary Insurance Trust.  Daly Decl. ¶ 3; Ex. A.  CCCLC is

an independent labor association and is not a part of or affiliated with the County of Contra Costa.

---

[1]     Defendant Lincoln National Life Insurance Company is the successor in interest to
Jefferson Pilot Financial Insurance Company.  Daly Decl. ¶ 2.  Jefferson Pilot merged
into Lincoln on or about July 2, 2007.  Id.

United States District Court
For the Northern District of California

1  Penkala Decl. ¶ 2; Spann Decl. ¶ 3.[2]  CCCLC, which collectively bargained on behalf of a number of

2  unions on wages and health benefits, was initially formed for the purpose of monitoring the changes

3  in health within the County and starting a Contra Costa Health Plan.  Salvador Decl. ¶ 3.  CCCLC

4  intended to replace coverage previously obtained through Hartford.  Daly Decl. ¶ 3; Ex. A; Spann

5  Decl. ¶ 8; Ex. A.  The application was signed by Jacque Salvador on behalf of CCCLC.  Spann Decl.

6  ¶ 8; Salvador Decl. ¶ 2, ¶ 7.  Salvador was not employed by CCCLC, but was an administrative

7  assistant for Local 1, one of the unions that was part of CCCLC.  Salvador Decl. ¶ 4.

8         In a series of check boxes on the application, CCCLC selected several terms and conditions

9  for its group coverage under the long-term disability policy that impacted the amount of premium

10  that was charged for the group coverage.  Daly Decl. ¶ 5.  For example, CCCLC required that new

11  employees must have been employed for thirty days before becoming eligible for coverage, and

12  decided that the disability coverage would be available to all employees who worked at least twenty

13  hours per week, even though the standard was thirty hours per week.  Id. ¶ 5; Ex. A at 2; Spann

14  Decl. ¶ 9.  Further, CCCLC selected voluntary long term disability coverage but decided against

15  including other available coverages, such as employee/spouse voluntary accidental death and

16  dismemberment coverage, among others.  Daly Decl. ¶ 6; Ex. A at 3.  CCCLC also selected

17  "Employer Choice" for the voluntary long term disability coverage options, meaning that CCCLC

18  selected certain benefit options instead of allowing employees to select them on  their own.  Daly

19  Decl. ¶ 7; Ex. A at 3; Spann Decl. ¶ 9.  CCCLC also chose an elimination period of ninety days,

20  instead of 60 or 180 days, meaning that an employee's disability would have to persist for at least

21  ninety days before long term disability benefits could be paid under the policy.  Daly Decl. ¶ 7;

22  Spann Decl. ¶ 9.  CCCLC further determined that benefits would continue to age 65, rather than for

23  two or four years, and that benefits would be paid at 60% of the employee's salary.  Daly Decl. ¶ 7;

24  Spann Decl. ¶ 9.

25         On or about February 1, 2006, Jefferson Pilot issued coverage to CCCLC under the long-

26  term disability policy.  Daly Decl. ¶ 4; Ex. B.  After Jefferson Pilot issued coverage, the Benefit

27

28         [2]      Plaintiff raises several objections to Defendant's evidence.  After reviewing Plaintiff's
objections and Defendant's evidence, the Court overrules the objections.

1   Counselor Enrollment Team from The Parker Group, the Third Party Administrator, met with union

2   members on CCCLC's behalf to explain the coverage and to encourage them to enroll in the

3   coverage.  Spann Decl. ¶ 11.  The Benefit Enrollment Team provided union members with brochures

4   and enrollment forms and assisted them if they had questions in filling out the forms.  Id.  When

5   members enrolled, The Parker Group also provided them with group certificates to evidence their

6   coverage.  Id.

7         The County of Contra Costa deducted premium payments for the policy from CCCLC

8   member paychecks and remitted those payments to a CCCLC-appointed administrator, The Parker

9   Group.  Penkala Decl. ¶ 3; Spann Decl. ¶ 12; Salvador Decl. ¶ 5.  Beginning in 2003 through

10  November 2009, The Parker Group acted as the Third Party Administrator for the CCCLC.  Spann

11  Decl. ¶ 3.  The Parker Group acted on CCCLC's behalf in investigating different types of insurance

12  coverage from various carriers and negotiating premium rates.  Spann Decl. ¶ 4.  Spann, who was

13  the President, CEO and owner of the The Parker Group during the relevant time period, personally

14  presented coverage options to the CCCLC's Board of Directors for ratification and formal approval

15  every two years.  Spann Decl. ¶ 4.  According to Spann, the CCCLC's Board of Directors was

16  comprised of representatives of its affiliated unions, and the Board's approval was necessary before

17  insurance could be placed with an insurance carrier.  Id.  After coverage was placed with a particular

18  carrier, the coverage would be offered to participating union members as an optional membership

19  benefit.  Id. ¶ 5.  The Parker Group was actively involved in discussing and explaining the CCCLC's

20  benefit programs with members of CCCLC-affiliated unions, and in trying to enroll them in

21  coverage.  Id. ¶ 6.  Spann stated that CCCLC had a direct interest in enrolling as many members as

22  possible because higher participation rates could result in maintaining more affordable premium

23  rates for the members.  Id.  The Parker Group also assisted CCCLC and its union members in

24  submitting claims to carriers and on occasion assisted carriers in determining which policies applied

25  to a specific claim.  Id. ¶ 7.

26        The Parker Group also worked with the County of Contra Costa to process payroll

27  deductions for CCCLC's benefit programs, including the long term disability coverage.  Spann Decl.

28  ¶ 12 (stating that The Parker Group submitted lists of enrolled union members to the County and the

**United States District Court**
For the Northern District of California

1  County would send The Parker Group a single combined payment for the union members' insurance

2  premiums, which The Parker Group would then separate and remit to the insurers while retaining

3  records); Salvador Decl. ¶ 6 (stating that when a member purchased the coverage, the member also

4  signed an authorization to have the County deduct premiums from a paycheck).  Apart from the

5  payroll deductions, the County had no involvement with the long term disability coverage that

6  Jefferson Pilot issued to CCCLC.  Spann Decl. ¶ 13.  The coverage was a union benefit and the

7  County had no involvement in the creation, enrollment or administration of the long term disability

8  coverage.  Spann Decl. ¶ 13.

9      Salvador, the signatory on the coverage application, stated that as a union employee, he

10 received disability benefits through the union, but that at the time, CCCLC was unable to obtain the

11 same disability benefit for County workers, so CCCLC selected Local 1's insurance broker, The

12 Parker Group, to sell a voluntary disability policy for CCCLC members to obtain individually.

13 Salvador Decl. ¶ 5.  CCCLC did not perform any administrative duties regarding the long term

14 disability policy.  Salvador Decl. ¶ 5.  Further, Salvador states that none of the labor organizations

15 within CCCLC had any involvement with the policy or the collection of premiums.  Salvador Decl. ¶

16 6.  Neither Local 1 nor CCCLC recommended or encouraged members to purchase disability

17 insurance from Jefferson Pilot, and neither endorsed disability coverage.  Salvador Decl. ¶ 6.  The

18 policy was one of many options made available to members.  Salvador Decl. ¶ 6.  Local 1 and

19 CCCLC did not receive any compensation, bonus or commission from Jefferson Pilot or The Parker

20 Group.  Id.

21     In July 2008, Defendant received a claim for disability from Plaintiff under the policy.  Daly

22 Decl. ¶ 8.  Defendant then contacted The Parker Group to verify Plaintiff's coverage.  Spann Decl. ¶

23 14; Ex. B.  While investigating the claim, Defendant confirmed that Plaintiff was eligible for and

24 enrolled in CCCLC's group coverage under the policy through membership in her labor union, SEIU

25 Local 1021, an affiliate of CCCLC.  Daly Decl. ¶ 8; Ex. C; Spann Decl. ¶ 14.

26     Plaintiff states that she first heard about the long term disability coverage when she saw a

27 flyer on a bulletin board at work stating that a representative was going to be available to discuss the

28 coverage.  Hill Decl. ¶ 3.  She was told that the insurance company representatives would be in the

4

cafeteria for three days and if she was interested, she could talk to them about getting a policy.  Id. ¶ 4.  No one encouraged Plaintiff to sign up for the insurance, and her understanding was that her employer, the County of Contra Costa, was letting the insurance company use its space.  Id. ¶ 5. Plaintiff states that her union representative never told her to do anything about private disability insurance and she did not think that the long term disability insurance was a union-sponsored product.  Id. ¶ 5.  She states that: "The flyer on the bulletin board was no different to me than flyers offering tickets to Disneyland, or other offers."  Id.  The person selling the long term disability insurance was not a union representative and did not say that he was affiliated with the union.  Id. ¶ 6.  Plaintiff understood that he was selling a private insurance product.  Id.  Plaintiff was told that she would be responsible for paying all premiums, but that the County would deduct the premiums from her paycheck.  Id.

Plaintiff states that when she first applied for the insurance, the insurance company thought she was a union employee, although she was not, and that someone from the County wrote to the insurance company to tell them that she was a County employee.  Id. ¶ 7.  Plaintiff has never been employed by the CCCLC, and she does not know what the CCCLC is.  Id. ¶ 8.  Plaintiff was a member of the SEIU Local 1021, not an employee of the union, and has never been a member of Public Employees Union Local 1.  Id. ¶¶ 8, 10.  Plaintiff did not have voting rights with the CCCLC, did not participate in CCCLC and paid no dues to CCCLC.  Id. ¶ 9.

After Plaintiff received the long term disability policy, she did not speak to a union representative about it, and the union did not contact her or send her materials about her long term disability coverage.  Id. ¶ 11.  When she filed her disability claim, she wrote directly to Jefferson Pilot Insurance Company, and did not deal with or complain to any authority prior to seeking legal counsel in this matter.  Id.  Plaintiff did not believe that her long term disability policy was part of a benefit package.  Id. ¶ 12.

**Legal standard**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**Discussion**

**1.      Defendant is not estopped from bringing this motion**

Plaintiff argues that Defendant is estopped from arguing that ERISA preempts Plaintiff's claims based on two documents: (1) a claim summary dated October 4, 2010; and (2) a Disability Legal Referral Form dated in February 2011. Lilienstein Decl. Ex. 2. The claim summary form was dated two years after Plaintiff made her initial claim for benefits and seven months after her benefits were terminated, and states in relevant part that "State Claimant Resides: CA; Non-Erisa." The Disability Legal Referral Form contained two checkboxes -- "Group is ERISA," or "Group is Non-ERISA" -- and the box checked is "Group is Non-ERISA."

6

These documents constitute employee statements or writings opining on legal determinations that are not binding admissions of an insurer and do not determine the interpretation of an insurance contract. See, e.g., Group Voyagers, Inc. v. Employers Ins. of Wausau, 2002 U.S. Dist. LEXIS 3674, at *12-13 (N.D. Cal. Mar. 1, 2002) (". . . it is well settled that the statements of an insurer's employees are not determinative of the interpretation of an insurance contract."). Further, to establish estoppel, Plaintiff must show that she justifiably relied on the statements. Here, there is no evidence that Plaintiff even knew about these documents before discovery in this case, much less relied on them. See CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1881 (2011). Thus, Plaintiff's estoppel argument fails.

**2.     Plaintiff has raised a triable issue of fact on the threshold question of whether her long term disability policy was an employee benefit plan under ERISA.**

ERISA broadly preempts state law that relates to "any employee benefit plan" as described in the statute. 29 U.S.C. § 1144(a); see Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48 (1987). "[T]he existence of an ERISA plan is a question of fact, to be answered in the light of all the surrounding circumstances from the point of view of a reasonable person." Credit Managers Ass'n v. Kennesaw Life & Acc. Ins. Co., 809 F.2d 617, 625 (9th Cir.1987); see also Scott, 754 F.2d at 1503-04 (To hold that a plan exists, the court must be able to determine "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits."). An employee welfare benefit plan is defined as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1)(A); see also Scott v. Gulf Oil, 754 F.2d 1499, 1054 (9th Cir. 1985) ("ERISA does not contain a clear definition of the word "plan." The definition of "employee welfare benefit plan" itself uses the word 'plan': a 'plan, fund, or program ... established or maintained ... for the

7

United States District Court
For the Northern District of California

1  purpose of providing' the specified benefits. See 29 U.S.C. § 1002(1). Although ERISA contains

2  numerous requirements that a plan must adhere to-a written instrument, named fiduciaries, public

3  reports, etc., see id. §§ 1021-1031, 1101-1114 - these requirements are not part of the definition of

4  'plan.'"). ERISA preemption extends to state common-law causes of action as well as regulatory

5  laws. See Scott, 754 F.2d at 1504.

6      Plaintiff contends that the policy is not an ERISA employee benefit plan for several reasons,

7  including the policy's failure to provide for one or more named fiduciaries. See 29 U.S.C. §

8  1102(a)(1). Pursuant to the Court's order, the parties filed supplemental briefs on this issue. The

9  parties agree that naming a fiduciary is not a prerequisite to the establishment of an ERISA plan.

10  See Scott, 754 F.2d at 1503 ("Thus, the 'failure to meet these [ERISA] requirements does not

11  exempt [employers] from coverage by ERISA. Such failure merely indicates a failure by [employer]

12  to comply with ERISA. Were such failure to exempt [employer] from coverage by ERISA,

13  employers could escape ERISA's coverage merely by failing to comply with its requirements.").

14      Nonetheless, Defendant's failure to name a fiduciary, along with other information missing

15  from the policy, are strong indicia raising a triable issue of fact that ERISA does not apply to the

16  policy. In addition to failing to name a fiduciary, the policy does not describe any means or method

17  for funding the plan, does not contain a summary plan document, and does not have any language

18  about the operation or administration of a plan or amendment procedure. Plaintiff also notes that

19  Defendant did not identify a plan administrator or plan sponsor, and that the non-existent plan

20  administrator and sponsor did not comply with ERISA's reporting requirements. See, e.g., 29

21  U.S.C. § 1024(a) (requiring the filing of an annual report, a plan description, a summary plan

22  description, and modifications and changes with the Secretary of the Department of Labor); 29

23  U.S.C. § 1024(b) (requiring the administrator to publish a summary plan description and an annual

24  report to participants and beneficiaries of plan).

25      It is the insurer's burden to prove the existence of an ERISA plan. See Kanne v. Connecticut

26  General Life Ins. Co., 867 F.2d 489, 492, n.4 (9th Cir. 1988) (stating that the burden is on

27  defendants to prove facts necessary to establish the defense of ERISA preemption); see also Metoyer

28  v. American Int'l Life Ins. Co., 296 F. Supp. 2d 745, 750 (S.D. Tex. 2003) ("The mere fact that

1  coverage flows from the employment relationship is not sufficient to invoke ERISA.  The lack of

2  relevant information regarding Itochu's benefit plan creates significant doubt about the AIG Policy's

3  status as an ERISA plan.").  Here, Defendant has not carried its burden sufficiently to obtain

4  summary judgment.  First, even if Defendant is correct that the alleged failure to comply with

5  ERISA's reporting requirements does not bear on the issue of preemption, Defendant has cited no

6  case in which a court has found the existence of an ERISA plan in the absence of so many other

7  components of an ERISA plan.  Scott, which Defendant relies on, is inapposite.  In Scott, the court

8  stated:

9          We also agree with Donovan, however, that a mere allegation that an employer or
            employee organization ultimately decided to provide an employee welfare benefit is
10         not enough to invoke ERISA's coverage. See 688 F.2d at 1372-73. Such an allegation
            fails to allege the "establishment" of a plan. Something more is needed. In the context
11         of this case, however, a great deal more is alleged. Without passing on the minimum
            that must be alleged to justify preemption by ERISA, we find that the complaint in
12         this case contains allegations that, if true, would enable a reasonable person to
            "ascertain the intended benefits, beneficiaries, source of financing, and procedures for
13         receiving benefits." Donovan, 688 F.2d at 1373. That is clearly a sufficient allegation
            of the establishment of a plan.

14

15  Scott, 754 F.2d at 1504.  Here, although Spann's testimony about the policy and the role of The

16  Parker Group arguably constitutes the "something more" that Scott required, Plaintiff has proffered

17  the Salvador declaration which disavows any endorsement by CCCLC and minimizes its

18  involvement.  Although this case presents a close question, the Court concludes that Defendant has

19  failed to show the absence of a triable issue of fact as to the threshold issue of the existence of an

20  ERISA plan.

21  **Conclusion**

22          Accordingly, Defendant's motion for partial summary judgment is denied.  A case

23  management conference is scheduled for November 19, 2013.  A joint case management conference

24  statement shall be filed no later than November 12, 2013.

25          **IT IS SO ORDERED.**

26

27

28

**United States District Court**
For the Northern District of California

1

2   Dated: October 30, 2013

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_Elizabeth D. Laporte_

ELIZABETH D. LAPORTE
United States Magistrate Judge